IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DANIEL L. JONES,

     Plaintiff,

v.                        CASE NO. 2:09-cv-00800

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

## M E M O R A N D U M   O P I N I O N

    This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Daniel L. Jones (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on October 17, 2006, alleging disability as of March 15, 2003, due to slow learner, short attention span, hyper, back pain, vision, emphysema, headaches, and insomnia.  (Tr. at 8, 25, 179-83, 184-90, 211-18, 248-53, 259-64.)  The claims were denied initially and upon reconsideration.  (Tr. at 8, 25, 93-97, 98-102, 104-06, 107-09.) On October 1, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 110.)  The hearing was

held on April 2, 2009 before the Honorable Theodore Burock.  (Tr. at 8-21, 25-38, 120-31, 145-56.)  By decision dated April 27, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-21.)  The ALJ issued an amended unfavorable decision on May 14, 2009. (Tr. at 25-38.)  The ALJ's decision became the final decision of the Commissioner on June 24, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On July 10, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful

2

employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.   Id. §§ 404.1520(c), 416.920(c).   If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

3

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 10.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of visual impairment with headaches, back impairment, chronic obstructive pulmonary disease, hearing impairment, and borderline intellectual functioning.  (Tr. at 11-12.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 12-14.)  The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations.  (Tr. at 14-19.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 19.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as dishwasher, hand packer, and laundry worker which exist in significant numbers in the national economy.  (Tr. at 20.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was 49 years old at the time of the administrative

hearing.  (Tr. at 43.)  Claimant has an eighth grade education and

attended special education classes.  (Tr. at 45.)  In the past, he

worked as a laborer.  (Tr. at 79.)

## The Medical Record

The court has reviewed all evidence of record, including the

medical evidence of record, and will summarize it below.

## Physical Evidence

On October 21, 2005, Claimant visited New River Health

Association with complaints of left side headaches.  David Miller,

5

PA-C [physician assistant-certified] diagnosed "tension versus migraine type headache" and prescribed "Mazalt 5 mg one PO [Per Os - *Latin: by mouth, orally*] at onset of headaches." (Tr. at 364.)

On December 20, 2005, Claimant visited New River Health Association with complaints of mid-back pain due to coughing and slipping on ice. (Tr. at 363.) Mr. Miller diagnosed a lumbar strain and prescribed Flexeril 10 mg and Ibuprofen 800 mg without refills. (Id.)

On December 1, 2006, Claimant had a chest x-ray at Appalachian Regional Healthcare Beckley. Manu Patel, M.D., radiologist, stated:

> History: Smoker: 30 years. Short of breath.
> CHEST, TWO POSITIONS:
> No comparison study.
> There is no consolidation, lung mass or congestive failure. Mild COPD. Normal heart size and the pulmonary vasculature. Intact thorax.
> IMPRESSION:
> No active chest disease. COPD.

(Tr. at 307.)

On December 1, 2006, Claimant underwent spirometry testing which showed a "normal spirometry." (Tr. at 303-06.) Claimant is noted to be a smoker of 20 cigarettes per day for 27 years. (Id.) His COPD risk is noted to be "Moderate...If quit smoking: Low." (Id.)

On December 4, 2006, Mustafa Rahim, M.D., provided a consultative examination of Claimant and concluded:

1. I have told the patient that given his history of

6

COPD, he should stop smoking.  Treatment options have been discussed with the patient.
2.  The patient has a history of chronic low back pain, for which he needs to be evaluated...He should try over the counter medications.  He has not been taking any medications right now.
3.  The patient has difficulty in his vision... I suspect that the patient may have retrolental fibroplasia, which could present in premature babies when they are put in the incubator and removed quickly according to the patient's description.  However, I am not the specialist...

(Tr. at 311.)

On April 11, 2007, Claimant was examined by Lewis Gravely, M.D.  Dr. Gravely concluded that Claimant's visual acuity, near and distant, was 20/300 in the left and right eyes without correction. With correction, Claimant's vision was 20/60 in the right eye and 20/50 in the left eye.  He stated:  "He is very hyperopic and some of the visual deficit could relate to deprivation amblyopia.  He also has findings consistent with at least mild optic atrophy.  I would advise neurological evaluation.  Eye glasses provide moderate improved vision." (Tr. at 313.)

On May 21, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform heavy work and frequently perform all postural limitations.  (Tr. at 332-34.)  Claimant had no manipulative or communication limitations.  (Tr. at 335-36.) Claimant had unlimited visual limitations with the exception of "field of vision" which was noted as "mild limitation L > R eye." (Tr. at 335.)  Claimant had no environmental limitations save to

7

avoid fumes, etc. and hazards.   (Tr. at 336.)   The evaluator, Amy Wirts, M.D., noted:

> Claimant's statements are partly credible.  Severity of allegations are not well supported.   PFS [pulmonary function system] is normal.   Claimant has optic disc pallor with VA [visual acuity] OD 20/60 and OS 20/50 with somewhat constricted visual fields.  Goldman visual field testing 5/15/07 does not meet listing level severity using SSA criteria.  Visual efficiency is not less than 49% in the better eye.   He drinks coffee and cleans house.   He does laundry, vacuums, and mows grass.   He walks and shops.   He takes no medications for back pain.

(Tr. at 337.)

On July 30, 2007, A. Rafael Gomez, M.D. reviewed all the evidence in file and "affirmed as written" the May 21, 2007 Physical Residual Functional Capacity Assessment.

On December 4, 2007, Claimant had a lumbar spine x-ray at New River Health Association.  Andrew Wirt Goodwin, II, M.D. reported:

> Multiple views of the lumbar spine were obtained including AP, lateral, both obliques and lumbosacral spot.  There are moderate degenerative changes in the lumbar spine.   There is no evidence of recent bony injury.  Vertebral height and disc space intervals are well maintained.   Spinuous and transverse processes appear intact.  No soft tissue abnormalities are noted.

(Tr. at 375.)

On December 21, 2007, Claimant had spirometry testing at New River Breathing Center.  Dan Doyle, M.D. commented:   "Good effort/valid test.  Interpretation:  Mild obstructive ventilatory insufficiency."  (Tr. at 342.)

On December 21, 2007, Claimant had an audiogram at New River Family Health Center which revealed mild to moderate hearing loss.

Claimant was advised to make an appointment with an audiologist. (Tr. at 343.)

On January 16, 2008, Joan Worthington, D.O., New River Health Association, filled out a form titled "Medical Assessment of Ability to Do Work-Related Activities (Physical)." (Tr. at 344-47.) The form indicates Claimant has "degenerative disc changes lumbar spine, limited ROM [range of motion] lumbar, spine to 1/2 - 1/3 with palpable muscle tightness lumbar spine, history of back pain." (Tr. at 344.) The form indicates that Claimant's lifting/carrying, standing/walking, and sitting are affected by impairment and that Claimant is limited to lifting/carrying 10-15 pounds, standing/ walking/sitting one to two hours. (Tr. at 344-45.) Claimant's postural activities are limited to "occasionally." (Tr. at 346.) The form indicates that Claimant is totally restricted on environmental limitations due to "lung problems" and that he is limited in reaching, pushing/pulling, and hearing. (Id.)

On March 12, 2008, Claimant visited New River Health Association with complaints of itchy skin, stating that his son and daughter also had been itching. (Tr. at 362.) Dr. Worthington diagnosed scabies and prescribed "Kwell Lotion 1%, a large container for 5 persons or 5 separate containers." (Id.)

On April 22, 2008, Claimant visited New River Health Association with complaints of "headaches and nerve problems." (Tr. at 360.) Dr. Worthington noted Claimant "has had an eye exam

9

and is supposed to wear glasses, however, he does not wear these on a regular basis." (Id.) She diagnosed: "1. Headaches possible tension with a component of cluster as well. 2. He has some anxiety however he does consume excessive coffee." (Id.)

On May 8, 2008, Teppe Popovich, M.D. reviewed Claimant's CT brain scan. The scan was requested by Dr. Worthington due to Claimant's "worsening headaches, sees spots, blurred vision, primarily right frontal area." (Tr. at 350.) Dr. Popovich's findings were:

> There is no intracranial hemorrhage or abnormal extraxial fluid collection. There is a small subacute or chronic infarction within the left posterior parietal lobe and an old small infarction within the left frontal lobe. This raises the suspicion for embolic phenomenon and an MRI brain and a CTA of the head and neck are recommended for further evaluation. Ventricular system is normal in size and configuration. Paranasal sinuses are clear.

(Id.)

On May 27, 2008, Claimant visited New River Health Association for follow-up with Dr. Worthington regarding his headaches and to discuss the results of a CT report: "frequency of these [headaches] is every other day and Imitrex does relieve... Impression: 1. Subjective report of palpitations with caffeine over consumption. 2. Headaches. 3. Possible of embolic phenomena on CT report." (Tr. at 356.) An addendum noted that Claimant's cholesterol measurements were high at LDL 169 and cholesterol/HDL ratio of 5.7. (Tr. at 357.)

On May 29, 2008, Dr. Popovich reviewed Claimant's brain MRI.

Dr. Popovich's findings were:

> There is no restricted diffusion to indicate the previously described small infarctions within the left frontal and posterior parietal lobe are acute or subacute in nature. There is high T2 signal within both of these regions and brain volume loss. The appearance is suggestive of a non-acute process. The appearance is somewhat atypical for infarctions as there appears to be ring like high T2 signal in these regions, but there is no mass affect or of an underlying lesion. Depending upon the patient's symptoms, additional imaging with post contrast T1 in the coronal and axial plane could be acquired. There is no intracranial hemorrhage or abnormal fluid collection; the ventricular system is normal and configuration. Normal flow voids are maintained within all of the major intracranial arteries. The paranasal sinuses are clear.
> IMPRESSION:
> 1. No acute or subacute abnormality.
> 2. Probable old infarctions within the left frontal and left posterior parietal lobe.

(Tr. At 349)

On May 29, 2008, Aous Salim Al-Khaldi, M.D. reviewed a carotid sonogram of Claimant's head. Dr. Al-Khaldi's findings were:

> Color Doppler and gray scale images of the cervical carotids reveal that there is no thrombosis or occlusion. There is no significant plaque formation. The blood flow at both vertebral arteries appear to be cephalad. Doppler interrogation of the carotid arteries reveal systolic velocity, which is not indicative of any hemodynamically significant stenosis.

(Tr. at 348.)

On June 25, 2008, Claimant visited New River Health Association for prescription refills, including Nicoderm Patches, and to discuss his attempts to stop smoking. (Tr. at 354.) Dr. Worthington noted: "Impression: 1. Hyperlipidemia. 2. Migraine headaches by history. 3. Arthritis. 4. History of TIA

11

[transient ischaemic attack], mini-stroke." (Id.)

On February 9, 2009, Claimant visited New River Health Association to follow-up on headaches. Dr. Worthington stated:

> He reports having some family stressors and started getting headaches again in November...has been taking some Ibuprofen and aspirin with partial relief...He reports the Nicoderm patches to be ineffective for stopping smoking and he did start smoking again...
>
> PROBLEM LIST: Tobacco abuse. Alcohol use. Reflux...
>
> Impression: Headaches, tension versus migraine. Hyperlipidemia.

(Tr. at 374.)

On April 2, 2009, Judith Brendemuehl, M.D. testified at the Administrative Law Judge's hearing regarding Claimant's physical condition. (Tr. at 64-70.) Following a review of Claimant's records, she concluded that Claimant was capable of performing work at the medium exertional level. (Tr. at 69.)

Psychiatric Evidence

On December 1, 2006, a State agency medical source completed a Disability Determination Examination of Claimant. (Tr. at 296-302.) The evaluator, Sunny S. Bell, M.A., licensed psychologist, notes that Claimant has never been in psychiatric treatment. (Tr. at 297.) She further notes that Claimant has been arrested for assault, public intoxication, and three times for DUI [driving under influence]. (Tr. at 298.) Ms. Bell made these findings:

> MENTAL STATUS EXAMINATION: Appearance: Mr. Jones was cleanly, casually, and appropriately dressed. Grooming and hygiene skills were good... Vision difficulties were

12

noted.  When asked why he did not wear glasses, Mr. Jones stated, "I'm supposed to wear glasses all the time, but they bother me and give he a headache.  They don't help that much anyway."  No hearing difficulties were noted. Attitude/Behavior:  Mr. Jones was cooperative but unmotivated.  He interacted in a socially appropriate manner.  He spontaneously generated conversation and exhibited a sense of humor.  Eye contact was good.  He appeared comfortable.  Speech: His speech was clear, goal-directed and relevant.  Orientation:  He was oriented to the month, year, and day of the week but not oriented to the date.  He was oriented to person, place, and circumstance.  Mood:  His mood was normal, and his affect was broad.  Thought Process:  Thought processes were logical and organized.  Thought Content:  He reported no delusions, obsessions or phobias. Perception:  No perceptual problems were noted. Judgment:  Judgment was within normal limits.  When asked the envelope question, Mr. Jones replied, "I would put it in the mailbox." Suicidal/Homicidal Ideation:  He denied suicidal or homicidal ideations.  Immediate Memory: Immediate memory skills were within normal limits, and he could correctly repeat four items.  Recent Memory: Recent memory skills were within normal limits, and he could correctly recall three of four items after 30 minutes.  Remote Memory:  Remote memory skills were mildly deficient, and he had some difficulty recalling personal history.  Concentration:  Concentration was severely deficient, and he was unable to correctly perform serial threes.  Psychomotor Behavior:  He exhibited no gross psychomotor difficulties.

INTELLECTUAL ASSESSMENT:

WAIS-III:

| VERBAL SUBTESTS | SS | PERFORMANCE SUBTESTS | SS... |
|---|---|---|---|
| Average | 4 | Average | 4 |

| IQ SCALE: | SCORE: |
|---|---|
| Verbal | 66 |
| Performance | 63 |
| Full Scale | 62 |

| INDEX: | SCORE: |
|---|---|
| Verbal Comprehension | 67 |
| Perceptual Organization | 67 |

WRAT-3:

13

| SUBJECT | STANDARD SCORE | GRADE SCORE |
|---------|----------------|-------------|
| Reading | <45 | K |
| Spelling | <45 | K |
| Arithmetic | <45 | 1 |

VALIDITY:  It is not believed that the obtained results are an accurate estimate of Mr. Jones' true level of functioning.  His current scores are not commensurate with his vocational history.  He complained of poor vision throughout the evaluation... There were times Mr. Jones appeared unmotivated and with prompting would continue.  It is believed that Mr. Jones functions at a slightly higher level than current scores indicate.

DIAGNOSTIC IMPRESSION:

| Axis I | 305.00 | Alcohol abuse, sustained full remission |
| Axis II | 799.9 | Deferred. |
| Axis III | | Vision difficulties. |
| | | Back pain. |
| | | Emphysema (per claimant report).... |

DAILY ACTIVITIES:  When asked to describe a typical day, Mr. Jones stated "I help my wife clean a little."  Mr. Jones takes care of his own hygiene and grooming independently and adequately.  He helps with housework, cooking, dishes, and laundry.   He occasionally accompanies his wife shopping.  He and his son take care of the yard work.  Mr. Jones sets out several tomato and pepper plants each spring.  He sits outside.  He watches television.  He believes that he could manage his own finances but has never managed a checkbook.  He denied all other activities.

SOCIAL FUNCTIONING:  Based on the clinical interview, the mental status examination, and testing; Mr. Jones interacted within normal limits.  He visits with friends and family but denied that he attended family gatherings... He plays video games with his children.  He occasionally goes to the mall.  When to describe himself socially, Mr. Jones stated, "I'm fine with people."  He denied all other social activities.

PROGNOSIS:  Poor.
PACE:  Pace is within normal limits.
PERSISTENCE:  Persistence is within normal limits.
CAPABILITY:  It is not believed that Mr. Jones would be

capable of managing his benefits should they be awarded
due to his poor math skills.

(Tr. at 298-300.)

On April 26, 2007, a State agency medical source completed a
Psychiatric Review Technique form.   (Tr. at 314-27.)   The
evaluator, Rosemary L. Smith, Psy.D., found "No Medically
Determinable Impairment."   (Tr. at 314.)   She concluded that
Claimant's substance abuse disorder was in remission.   (Tr. at
322.)   Dr. Smith noted:

> Unmotivated but evidence we have does not suggest
> disabling mental impairment.  Functions pretty well and
> has a decent vocational history.  At the CE [consultative
> examination], concentration was "severely deficient", yet
> memory was WNL [within normal limits].   This is
> inconsistent because the first step in the memory process
> is concentration and attention.  As such, if one cannot
> concentrate, one cannot remember.   Also, he was not
> motivated in the testing.  Alcohol Abuse is in remission.
> There is no medically determinable impairment.

(Tr. at 326.)

On July 31, 2007, Jeff Harlow, Ph. D., Licensed Psychologist,
reviewed the evidence and concluded "The 4/26/07 PRTF [Psychiatric
Review Technique Form] is affirmed on the basis of analysis of
evidence in file."   (Tr. at 341.)

Non-Medical Evidence

The record contains education records from Pitts County, North
Carolina Schools.   (Tr. at 268-95.)   Although most of the records
are illegible, one note checks that Claimant has "obvious
abnormalities" of the eyes.   (Tr. at 271.)   A handwritten note

15

states "Much of the time Danny stays frustrated.  He is the only one in the room who does not excel in some area."  (Tr. at 277.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ disregarded the opinion of Claimant's treating physician, Joan Worthington, D.O. regarding Claimant functional capacity, failed to give substantial weight to her opinions and to consider the length of time Claimant had been under her care.  (Pl.'s Br. at 8-10.)

The Commissioner responds that substantial evidence supports the ALJ's rejection of Dr. Worthington's assessment that Plaintiff could not perform medium work as the assessment was not supported by the medical evidence, including the opinions of Dr. Rahim and Dr. Brendemuehl, and Dr. Worthington's own treatment notes. (Def.'s Br. at 8-11.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2008).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward

16

v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2005).

Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3)-(5) and 416.927(d)(3)-(5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.297(d)(1), more weight generally is given to an examiner than to a non-examiner.  Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other

17

evidence in the record." <u>Martin v. Secretary of Health, Education and Welfare</u>, 492 F.2d 905, 908 (4th Cir. 1974); <u>Hayes v. Gardener</u>, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." <u>Smith v. Schweiker</u>, 795 F.2d 343, 346 (4th Cir. 1986).

In his decision, the ALJ fully considered the evidence of record from Dr. Worthington and the assessment she completed on January 16, 2008. (Tr. at 29, 33-36.) He noted

> On May 27, 2008, Dr. Worthington indicated the claimant reported having some fluttering of his heart. However, Dr. Worthington further noted the claimant admitted to drinking a pot of coffee and smoking a pack of cigarettes per day. She indicated the claimant had subjective report of palpitations with caffeine over consumption (Exhibit 13F, p3). The claimant is not undergoing cardiac treatment or taking medication other than an aspirin a day...

(Tr. at 29.)

> Furthermore, concerning the complaint of breathing problems Joan Worthington, D.O., at New River Health Association, indicated on March 12, 2008, that the claimant was smoking two packs per day. However, Dr. Worthington noted the claimant was in no acute distress (Exhibit 13F, p9). On June 25, 2008, Dr. Worthington indicated the claimant reported he was feeling good without any problems. Dr. Worthington found the claimant's lungs were clear to auscultation (Exhibit 13F, p1). These records indicate the claimant's chronic obstructive pulmonary disease is under good control. The objective findings are totally inconsistent with the degree of breathing problems alleged by the claimant and again reveal he is not credible...

> Dr. Worthington indicated on April 22, 2008, that the claimant complained of headaches on a daily basis. However, Dr. Worthington noted the claimant had an eye

18

examination and was supposed to wear glasses, but was not
wearing them on a regular basis.  The claimant reported
to Dr. Worthington that his headache was relieved
somewhat with Tylenol and Ibuprofen.  He indicated that
he also had a nagging ache sensation in his head, but
this did not keep him from doing his daily activities.
Dr. Worthington instructed the claimant to cut down on
his coffee gradually by one cup per day and to try to
wean himself off to one cup per day.  She recommended the
claimant try Imitrex and Daprosyn.  Dr. Worthington
instructed the claimant to undergo imaging studies
(Exhibit 13F, p7).  Again on May 27, 2008, the claimant
reported to Dr. Worthington that Imitrax did relieve his
headaches.  These records reveal the claimant's headaches
are relieved with medication.  The claimant was
instructed to decrease his intake of caffeine.  It is
also noted the claimant acknowledged that headaches did
not keep him from doing his daily activities.

As instructed by Dr. Worthington the claimant underwent
testing due to the complaint of headaches.  However, a
report of Carotid Sonogram dated May 29, 2008,
indicated...there was no thrombosis or occlusion.  There
was no significant plaque formation... Also, an MRI
report of the brain showed the claimant had impressions
of no acute or subacute abnormality...Dr. Brendemuehl
testified that this testing did show the claimant had
changes in the brain, but this does not suggest a stroke.
In fact, Dr. Brendemuehl opined the findings were not
sufficient that the claimant would experience symptoms or
his functioning would be affected.

Subsequent to the hearing the claimant's representative
submitted a treatment note dated February 9, 2009, in
which the claimant reported to Dr. Worthington that he
"started getting" headaches again in November.  However,
the claimant acknowledged that he was taking Ibuprofen
and aspirin with partial relief...Dr. Worthington noted
the claimant was in no acute distress, but had started
smoking again.  She prescribed Naproxen for less severe
headaches and instructed the claimant to take Imitrex for
more severe headaches (Exhibit 21F, p3)... The evidence
indicates the claimant's headaches are fairly well
controlled with medication.  In fact, the claimant
acknowledged that even over-the-counter gave him partial
relief...

Dr. Worthington noted on June 25, 2008, that the claimant

19

was feeling good without any problems at this time.  She
indicated the claimant was attempting to quit smoking and
had obtained Nicoderm patches (Exhibit 13F, p1).  The
claimant is maintained with conservative treatment, which
is primarily medication.  In fact, there is no evidence
of intensification of treatment, which would be expected
if the claimant was as limited as alleged.

(Tr. at 33-35.)

Regarding the physical assessment form completed by Dr.

Worthington, the ALJ stated:

Joan Worthington, M.D., completed a physical assessment
form on January 16, 2008, in which she indicated the
claimant could lift or carry 10 to 15 pounds frequently
and 15 pounds occasionally.  The claimant could stand or
walk a total of two hours and sit a total of two hours
during an eight-hour workday.  He could occasionally
climb, balance, stoop, crouch, kneel, and crawl.  The
claimant was limited in the ability to reach, push, pull,
and hear.  He had to avoid exposure to heights, moving
machinery, temperature extremes, chemicals, dust, noise,
fumes, humidity, and vibration (Exhibit 11F).  The
undersigned rejects these opinions by Dr. Worthington as
there is no evidence to support finding the claimant can
only perform a four hour workday.  The limitations are
extreme and inconsistent with even the treatment notes by
Dr. Worthington.  The claimant's activities of daily
living indicate he functions at a much higher level than
the limitations in this assessment.

(Tr. at 35-36.)

The court finds that the ALJ adequately and properly weighed

the evidence of record from Dr. Worthington and that his findings

are supported by substantial evidence of record.  The ALJ is

correct in his determination that Dr. Worthington's opinions

regarding claimant's physical assessment form are not well

supported by her own treatment notes, acceptable clinical and

laboratory diagnostic techniques or the remaining evidence of

20

record.   Substantial evidence of record indicates that Claimant could perform medium work.   The objective evidence of record were largely normal.   Dr. Worthington's own treatment notes do not indicate the presence of significantly limiting impairments or resulting limitations with respect to Claimant's back and lungs. Furthermore, the remaining evidence of record, from Dr. Brendemuehl, the State agency medical sources, Dr. Wirts, Dr. Gomez, Dr. Rahim, and others, are not consistent with Dr. Worthington's physical assessment opinion.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.   Accordingly, by Judgment Order entered this day, the final decision of the Commission is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: July 8, 2010

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

21